**SO ORDERED.**

**SIGNED this 18 day of February, 2011.**

_____
**Randy D. Doub
United States Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
WILMINGTON DIVISION

IN RE:

| | |
|---|---|
| DONALD BENSON | CHAPTER 11 |
| JUDITH BENSON, | CASE NO. 09-10540-8-RDD |
| DEBTORS | |

ORDER DENYING CONFIRMATION OF
CHAPTER 11 PLAN OF REORGANIZATION

Pending before the Court is the Second Amended Chapter 11 Plan of Reorganization filed on November 2, 2010 (the "Amended Plan") by Donald Benson and Judith Benson, d/b/a SMB Carolinas, Inc., f/d/b/a Stone Mill Builders, Inc. (the "Debtors"), the Objection to the Chapter 11 Plan of Reorganization filed on December 21, 2010, by Wells Fargo Bank, National Association, successor by merger to Wachovia Bank, National Association ("Wells Fargo"), the Objection to the Chapter 11 Plan of Reorganization filed on December 20, 2010, by Branch Banking and Trust Company ("BB&T") and the Bankruptcy Administrator's Response to Debtors' Plan of Reorganization filed on December 20, 2010.  The Court conducted a hearing on the Amended Plan and the objections thereto on January 4, 2011 in New Bern, North Carolina.

## BACKGROUND

On December 3, 2009, the Debtors filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code. The Debtors are individuals and have been engaged in the business of commercial and residential construction. In 1992, the Debtors formed Stone Mill Builders, Inc. for the purpose of business and residential construction. Subsequently, the name Stone Mill Builders, Inc. was changed to SMB Carolinas, Inc. ("SMB"). SMB eventually became the Debtors' sole source of income. SMB invested in various parcels of land in both North Carolina and South Carolina for future development or construction. Throughout their business dealings, the Debtors signed personal guaranties for business debt secured by company owned land and buildings to both BB&T and Wells Fargo. Additionally, the Debtors conveyed a deed of trust secured by their primary residence and an office building located in Leland, North Carolina to BB&T for a working capital loan to be used in connection with their construction business. In 2000, the Debtors sold a one-third (1/3rd) interest in SMB to Dennis Pinkleton, an investor. The decline in the real estate market caused the Debtors' income to decrease and rendered them unable to service their secured and unsecured debts.

Based on the arguments of counsel and the evidence presented to the Court at the hearings, confirmation of the proposed Plan is **DENIED** for the reasons set forth herein.

## BEST INTEREST OF CREDITORS TEST

Section 1129(a)(7) provides that in order for a plan to be confirmed, the plan must provide creditors with at least as much as the creditors would have received in a Chapter 7 liquidation. *In re A.H. Robins, Co., Inc.,* 880 F.2d 694, 698 (4th Cir. 1989); *In re Smith*, 357 B.R. 60, 67 (Bankr.

2

M.D.N.C. 2006); *In re Grandfather Mountain Limited Partnership*, 207 B.R. 475, 484 (Bankr. M.D.N.C. 1996); *In re Piece Goods Shops Company, L.P./Piece Goods Shops Corp.*, 188 B.R. 778, 791 (Bankr. M.D.N.C. 1995). This section is commonly referred to as the best interest of creditors test. The plan proponent bears the burden of introducing evidence of its current financial situation, assets, liabilities, and prospects to satisfy the court that the proposed plan meets this test. *In re Piece Goods*, 188 B.R. at 791.

Class XIV of the Amended Plan consists of general unsecured claims which total approximately $4,794,939.00 and does not include any allowed deficiency claims from Classes IX, X, XI and XII. The Amended Plan proposes to pay Class XIV claimants $190,000.00 plus interest at three percent (3%) per annum over a period of two (2) years in equal quarterly installments of $1,500.00. Starting in year three (3), and for a period of fifteen (15) years thereafter, the payments to Class XIV claimants increase to equal quarterly installments of $3,687.72. Based on the ballots presented at the hearing, Class XIV voted to reject the Amended Plan.

The feasibility analysis, set forth in the Amended Disclosure Statement filed by the Debtors on November 2, 2010, provides that plan payments of $500.00 per month (which equals a $1,500.00 quarterly payment) would be paid to Class XIV claimants during the first and second year of the confirmed plan and then $1,229.24 per month (equaling the $3,687.72 quarterly payment) commencing the third year of the Amended Plan. The feasibility analysis states "[t]he Debtors propose to sell the furniture in their mountain house. In addition . . . the Debtors expect to receive tax refunds for 2010. They expect to receive at least $12,000 from those two sources which will be paid prorata to the unsecured creditors $500 monthly during the first two years."

The liquidation analysis, also set forth in the Amended Disclosure Statement, reflects that the Debtors received a tax refund from the Internal Revenue Service ("IRS") for the tax year of 2005 in the amount of $91,933.00 on July 23, 2010. The Debtors anticipate a tax refund from the North Carolina Department of Revenue for the tax year of 2005 in the amount of $21,624.00.[1] The Debtors propose to retain their 2005 federal and state tax refunds, but "are prepared to use the tax refunds as necessary to cover any shortfall during the early years of the Plan." The two tax refunds are not listed in the Debtors' schedules and are not claimed as exempt. At the hearing, Mrs. Benson testified that the Debtors have used approximately $10,000.00 of the tax refund received from the IRS to pay the homeowner's insurance on their mountain house, residence and office building.

A debtor's tax refunds withheld from the debtor's income pre-petition are property of the bankruptcy estate. *Kokoszka v. Belford*, 417 U.S. 642, 648 (1974); *In re Hughes*, 2009 WL 2252181 at *3 (Bankr. D.Utah 2009) (citing *In re Barowsky*, 946 F.2d 1516 (10th Cir. 1991)). The Debtors' tax refunds in the amounts of $91,933.00 and $21,624.00 constitute property of the estate. In a hypothetical Chapter 7 liquidation, the Debtors' tax refunds would be distributed pro-rata to unsecured creditors in accordance with the priorities set forth in the Bankruptcy Code and would not have been paid to satisfy the homeowner's insurance payments as the Debtors elected to do. In a liquidation scenario, the value of the Debtors' tax refund is worth more today if paid to creditors in a lump sum as opposed to creditors receiving quarterly installments over seventeen (17) years.

---

[1] Both the IRS and North Carolina Department of Revenue refunds for the tax year of 2005 result from the recalculation of the Debtors' tax liability based on the inclusion of the Debtors' 2009 business losses which permit amendment of the 2005 tax returns since such losses can be carried back.

Therefore, the proposed retention of the tax refunds, when viewed in light of the liquidation analysis, would prevent the Debtors from satisfying the liquidation test.

In addition, the Court has concerns with the accuracy of the Debtors' liquidation analysis. The Debtors' liquidation analysis is inconsistent with the testimony presented to the Court at the confirmation hearing. The Debtors' liquidation analysis shows that under a hypothetical Chapter 7, the unsecured creditors would receive $182,940.10.

The Debtors contend the office building and lot are valued at $440,000.00.[2] Wells Fargo has a first priority deed of trust on .312 acres, which is a portion of the property, located at 1485 Lanvale Road in Leland, North Carolina. Wells Fargo filed a proof of claim in the amount of $139,576.58 to which the Debtors have not objected. BB&T has a second priority deed of trust on the office building and lot at 1485 Lanvale Road in Leland, North Carolina (the "Office Property") and filed a proof of claim in the amount of $202,249.66.[3] The total of these two secured claims is approximately $342,000.00. Therefore, based on the Debtors' valuation, there appears to be approximately $98,000.00 of equity in the Office Property.

Pursuant to the Amended Plan, the Debtors propose to sell lots 5 and 6 at Elderberry for a combined price of $70,000.00, a lot on Bluff Road for $20,000.00, and a parking lot adjacent to the Office Property for $40,000.00. The Debtors failed to present any evidence, beyond their testimony

---

[2]The Debtors' Schedule A lists the "Current Value of Debtor's Interest in Property, without Deducting any Secured Claim or Exemption" in the office building and lot as $650,000.00.

[3]The second priority deed of trust in the amount of $202,249.66 is also the fourth priority deed of trust on the Debtors' residence. The Court does not believe there will be any value left in the Debtors' residence to satisfy any of the $202,249.66 claim. Debtors are now proposing to surrender their residence.

at the hearing, as to the reasonableness of these proposed sale prices. However, assuming the values are appropriate, the gross sales proceeds for these lots would be $130,000.00.

In addition to liquidating certain real property, the Debtors propose to sell the furniture in their mountain house. At the hearing, Mrs. Benson testified that in her opinion, she believed she could obtain anywhere from $7,000.00 to $10,000.00 for the furniture. She also testified that prior to the hearing, she received an offer of $5,000.00 for the mountain house furniture.

To fund the Amended Plan, the Debtors intend to utilize tax refunds.[4] As previously stated, the Debtors anticipate tax refunds based on an adjustment of their losses in connection with their 2005 federal and state tax refunds. The Debtors previously received the federal tax refund of $91,933.00 and anticipate additional funds from North Carolina in the amount of $21,624.00. In addition, the Debtors anticipate receiving tax refunds for 2010.

Therefore, based on the Debtors' proposed calculations, the total funds available through the liquidation of certain real property, the sale of personal property, and the receipt of tax refunds, would generate gross funds in the amount of $688,557.00. After payment of $139,576.58 to Wells Fargo and $202,249.66 to BB&T on their secured claims, the remaining amount of $346,730.76 would be subject to distribution pursuant to the priorities set forth in the Bankruptcy Code.

---

[4]The pre-petition tax refunds are property of the estate and would be available for distribution to creditors in a liquidation. See *Kokoszka v. Belford,* 417 U.S. 642 (1974); In re Hughes, 2009 WL 2252181 (Bankr. D.Utah 2009).

However, should this case be converted to one under Chapter 7, administrative costs would be incurred for realtor commissions and the commission for the Chapter 7 Trustee.[5] Therefore, after subtracting realtor and Chapter 7 trustee commissions of $94,677.85 from the net proceeds of $346,730.76, approximately $252,052.91 would be available for distribution to creditors.[6] This

---

[5] The calculations set forth herein assume a commission of ten percent (10%) to a realtor based a combined sales price of $570,000 for liquidation of the real property; thereby resulting in a realtor commission of $57,000.00. The commission due to the Chapter 7 Trustee would be $37,677.85 and is calculated based on the total receipt of $688,557.00.

Calculation of Best Interest of Creditors Test:

| | | |
|---|---|---|
| Gross Proceeds after Liquidation: | Office Property | $440,000.00 |
| | Four Other Properties | $130,000.00 |
| | 2005 Tax Refunds | $113,557.00 |
| | Personal Property - Furniture | $   5,000.00 |
| | **Total Proceeds** | **$688,557.00** |
| | | |
| Claims Secured by Office Property: | Wells Fargo | $139,576.58 |
| | BB&T | $202,249.66 |
| | **Total Secured Claims** | **$341,826.24** |
| | | |
| Realtors' Commission on $570,000.00: | | $ 57,000.00 |
| | | |
| Chapter 7 Trustee's Commission on $688,557.00: | | $ 37,677.85 |
| | | |
| Attorney's Fees for Chapter 7 Trustee: | | Unknown |
| | | |
| **Net Proceeds Available for Distribution:** | | **$252,052.91** |

[6] The Amended Disclosure Statement states that $182,940.10 would be available for unsecured creditors. The Debtors included in their liquidation analysis a residential exemption claim of $70,000.00 in the residence, which they now plan to surrender and abandon.
   Counsel for Debtors states that the Debtors intend to reside at the Office Property and that they intend to amend their exemptions to claim the residential exemption in the Office Property. Whether the exemption would be allowed is not an issue presently pending before the Court. But see In re Alexander, 236 F.3d 431,432 (8th Cir. 2001) (stating that when converting a bankruptcy case from one under Chapter 13 to one under Chapter 7, the original petition date determines the debtor's eligibility to claim an exemption); In re Lowe, 103 F.3d 20 (5th Cir. 1997) (finding that exemptions are determined on the petition date, when a case is converted from one under Chapter 13 to one under Chapter 7, and citing § 522(b)(3)(A) which states

figure could be reduced if the Chapter 7 Trustee incurs attorney's fees. Because the Debtors propose to pay unsecured creditors an amount less than the projected amount the unsecured creditors would receive in a liquidation, the Debtors have not shown by a preponderance of the evidence that the Amended Plan satisfies the best interest of creditors test as required by Section 1129(a)(7) of the Bankruptcy Code.

Therefore, the Debtors have failed to carry their burden of proof to satisfy the Court that the Amended Plan meets the best interest of creditors test.

## FEASIBILITY OF THE AMENDED PLAN

Section 1129(a)(11) of the Bankruptcy Code requires that in order for a plan to be confirmed, "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." This requirement is often called the feasibility requirement. *In re A.H. Robins, Co., Inc.* 880 F.2d 694, 698 (4th Cir. 1989). The question of feasibility is a question of fact in which the debtor bears the burden to show feasibility of the plan by a preponderance of the evidence. *In re Investment Co. of Southwest, Inc. (F.H. Partners, L.P. v. Investment Co. of Southwest, Inc. et. al)*, 341 B.R. 298, 310 (B.A.P. 10th Cir. 2006). Feasibility

---

exemptions are determined "on the date of the filing of the petition.").

As of the hearing date, the residential exemption has not been amended. Therefore, for the purposes of the liquidation test, the proposed amendment of the residential exemption will not be considered in the calculation of non-exempt assets. If the Debtors do amend the residential exemption, creditors and parties-in-interest would have an opportunity to object.

The Court also notes that the Debtors included in their liquidation test, sale of other non-exempt personal property with a total value of $16,605.00. The Court, however, need not consider this amount in its calculation as the Debtors do not satisfy the liquidation test. See Amended Disclosure Statement, docket entry 142, page 32, filed on November 2, 2010.

is "firmly rooted in predictions based on objective fact." *In re Cheatham*, 78 B.R. 104, 109 (Bankr. E.D.N.C. 1987); *In re Investment*, 341 B.R. at 310.

*In re Piece Goods Shops Company, L.P./Piece Goods Shops Corp.*, the Bankruptcy Court for the Middle District of North Carolina set forth factors a court may consider in assessing feasibility. 188 B.R. 778, 798 (Bankr. M.D.N.C. 1995). These factors include "the capital structure of the reorganized [d]ebtors, their projected earning power, economic conditions, management's ability and likelihood of continuing to work for the reorganized [d]ebtors, and any other factors relevant to the performance of the [p]lan." *Id.* (citing *In re Polytherm Industries, Inc.*, 33 Bankr. 823 (W.D. Wis. 1983)).

The feasibility analysis states the Debtors' projected income is $9,363.29 per month and that their projected expenses are $9,363.44 per month for the first two years of the proposed plan. Starting in the third year of the proposed plan, the Debtors' proposed expenses are $9,092.68 per month. The projected income remains the same for year three.

To calculate their projected income, the Debtors added: (1) the Debtors' monthly net income from employment and Social Security in the amount of $4,804.00 per month; (2) the 2005 IRS and North Carolina tax refunds which will be used to pay creditors on a monthly basis in the amount of $1,892.62 per month over sixty (60) months;[7] (3) the net proceeds from sale of lots five and six at Elderberry in the amount of $70,000.00, the lot on Bluff Road for $20,000.00, and the parking lot adjacent to Office Property for $40,000.00 equating to $2,166.67 per month; and (4) the net proceeds

---

[7]The tax refunds should be disbursed to the unsecured class upon confirmation of a plan of reorganization and not held by the Debtors to be used to fund the plan over sixty (60) months.

from sale of the mountain house furniture and any 2010 tax refunds over the first two years of plan in the amount of $500.00 per month.[8]

However, the feasibility analysis includes a disclaimer related to the projected income. The disclaimer provides: "[a]ll of the above income figures are contingent on the occurrence of certain events. The Debtors neither know precisely when Mrs. Benson's accounting income will increase as projected nor do they know when they will be able to sell their various parcels of real estate . . . . [t]he sales proceeds from real estate are estimated conservatively. It is hoped that the Debtors will be able to take their time marketing these parcels in order to take advantage of rising real estate prices during the hoped for recovery."

The Court does not believe the feasibility analysis presented by the Debtors presents an accurate representation of the Debtors' ability to make payments pursuant to their proposed Amended Plan. Schedule I, attached to the Debtors' Amended Disclosure Statement as Exhibit D-1, provides that Mrs. Benson earns $900.00 as income from part-time contract work as a certified public accountant ("CPA"). Schedule I also states "[t]he female Debtor's income from her part-time contract work is $900. She believes that she will be able to increase her account[ing] practice income from the present average of $900 per month to $3,600 within the next year." The Debtors rely on the increase of Mrs. Benson's income to fund their plan.

At the hearing, Mrs. Benson testified that she has practiced as a CPA for approximately twenty-five (25) years and until recently she devoted all of her CPA work to providing financial

---

[8]Liquidation of assets should result in a lump sum payment to unsecured creditors rather than providing a source of income for the Debtors. Otherwise, the creditors are not receiving an amount equal to the value of their claim as they would in a Chapter 7 liquidation. 11 U.S.C. § 1129(a)(7)(a)(ii).

services within the construction industry. Currently, Mrs. Benson no longer focuses her CPA work within the construction industry and is seeking employment as a CPA outside of the construction industry. Mrs. Benson testified that not many CPA positions are available in the current job market, but that she is in the process of building up her own CPA practice. She testified that she currently has one client and works approximately ten (10) to twelve (12) hours per week. Mrs. Benson testified that it would take time to build up her business and that building a CPA practice is not a task that can be achieved overnight.

The possibility of Mrs. Benson earning as much as $3,600.00 per month is speculative given her current numbers. The Court recognizes that time is involved in developing a client base but also has serious concerns with the Debtors' ability to make the payments required under the proposed plan. The Debtors admit that their projected income figure, as presented in the feasibility analysis, is contingent on the occurrence of certain events, including (1) Mrs. Benson building her CPA practice such that she can earn $3,600.00 per month; and (2) liquidating certain real property at price points established by the Debtors.[9]

In addition, the Debtors included their 2005 federal and state tax refunds as part of the projected income calculation. These refunds are property of the estate and should be distributed to creditors. These amounts should not be included as part of the Debtors' projected income.

Regardless of the speculation and inclusion of the tax refunds in the projected income calculation, even if the Debtors are given the benefit of the doubt, the Debtors' total monthly income is $9,363.29, which is almost equal to their expenses of $9,363.44. Given the lack of evidence that

---

[9]The Court notes for the record that other than the Debtors' testimony, there was no evidence offered in connection with the value of the real property.

there would be sufficient, regular monthly income which would be generated by the Debtors to maintain their plan payments, the Debtors have failed to show that the Amended Plan is feasible by a preponderance of the evidence.

The Court finds that based on the evidence presented at the hearing, and the arguments of counsel, the Amended Plan is not feasible.

Therefore, the Amended Plan fails to satisfy the requirements of Section 1129 of the Bankruptcy Code and confirmation of the Amended Plan is **DENIED**.

**SO ORDERED**.

**END OF DOCUMENT**